DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} Juaquene Solomon was convicted of beating up his live-in girlfriend and resisting arrest. He has argued that the trial court: (1) incorrectly prohibited him from presenting testimony of three witnesses regarding his girlfriend's alleged reputation for being untruthful; (2) incorrectly received into evidence a recording of two telephone calls his girlfriend placed to the 911 operator on the day of the alleged beating for which, according to him, the State had failed to establish a proper foundation; (3) incorrectly prohibited him from playing for the jury a recording of a 911 telephone call by his girlfriend from six days prior to the *Page 2 
alleged beating; and (4) incorrectly prohibited him from cross-examining a police officer regarding whether the officer knew or worked with the prosecutor's husband. This Court affirms the trial court's judgment because: (1) none of the proffered witnesses had sufficient contacts with the community in which Mr. Solomon's girlfriend lived to be able to testify about her alleged reputation for being untruthful; (2) although the trial court erred by receiving the recording of the telephone calls from the day of the beating into evidence, that error was harmless beyond a reasonable doubt; (3) even if this Court were to conclude that the trial court erred by not allowing Mr. Solomon to play the recording of the other 911 call for the jury, it could not conclude that Mr. Solomon was prejudiced by that error because he failed to proffer the recording; and (4) although the trial court erred by not allowing Mr. Solomon to cross-examine the police officer about whether he knew or worked with the prosecutor's husband, that error was harmless beyond a reasonable doubt in regard to Mr. Solomon's conviction for domestic violence and his appeal from his resisting arrest conviction is moot.
 THE TESTIMONY {¶ 2} Mr. Solomon lived with Lorrie Mitchell for approximately ten months. According to Ms. Mitchell, on the day of the alleged beating, Mr. Solomon had taken a truck belonging to her without her permission. She testified that he did not have a driver's license and that she became upset every time he took one of her vehicles "because it put everybody in jeopardy." She was also *Page 3 
upset with him that day because, when he left, he took a check payable to him, but for which she had already given him the cash. She had intended to take the check to her bank and deposit it in her account.
 {¶ 3} Ms. Mitchell testified that she and Mr. Solomon exchanged a number of telephone calls that day. According to her, she had a doctor's appointment and no money and he had her truck, so she was asking when he would be coming home. She said that his response was that he should be able to do what he wanted and that he was not coming home because she was yelling at him.
 {¶ 4} At some point, Ms. Mitchell telephoned Mr. Solomon's mother's house to see if his mother was home, because she intended to take Mr. Solomon's belongings there. His mother was not home so Ms. Mitchell left a message. When Mr. Solomon's mother returned home, she and a family friend went to Ms. Mitchell's house. They were there when Mr. Solomon returned.
 {¶ 5} Upon Mr. Solomon's return, he and Ms. Mitchell started arguing. Ms. Mitchell testified that, when the family friend asked whether she wanted Mr. Solomon there, she responded that she did not. According to her, Mr. Solomon then said he wanted to get some sleep because he needed to go to work and that they would "deal with this tomorrow." At that point, his mother and the family friend left. *Page 4 
 {¶ 6} Ms. Mitchell testified that, after Mr. Solomon's mother and the friend left, she and Mr. Solomon continued to argue, although, at first, it was not as heated. She said that he was upset because she had called his mother, who had been sick. According to her, he also said that she should be more patient and that he was a grown man and should be allowed to do what he wanted. She mentioned her doctor's appointment and asked if he did not know how sick she was.
 {¶ 7} Ms. Mitchell testified that Mr. Solomon then started punching the back of her head. She said that he "propelled" her "from the living room through the hallway into the dining room, repeatedly punching [her in] the back of the head until [she] dropped to the floor." According to her, once she fell to the floor, he began kicking the back of her head, her neck, and her ribs. She curled up in a ball and tried to protect her head and neck with her hands.
 {¶ 8} Ms. Mitchell testified that Mr. Solomon pulled her up by her hair and put her in a chair, all the while continuing to hit her in the head with his fist. She said that he told her she needed psychological help, to which she responded that she had an appointment with a counselor that evening. The argument then shifted to whether she had put the claimed appointment on her calendar. She said he forced her up the stairs to look at the calendar, telling her he was going to kill her if the appointment was not on the calendar. She said that, once they got upstairs, she curled up on the bed and he sat down next to the bed and began *Page 5 
talking calmly. Every time she thought it was safe to get up, however, he would hit her again.
 {¶ 9} Ms. Mitchell testified that Mr. Solomon eventually calmed down somewhat. He asked her why she could not "leave people out of our business" and why she could not let him "be a man." According to her, he also told her that he had AIDS and had come home to give it to her because she was a bitch. He then said he was going to put on his "jail clothes" and changed into other clothes. He also asked her why she had "[made] this happen."
 {¶ 10} Eventually, according to Ms. Mitchell, Mr. Solomon gathered all the telephones in the house, went downstairs, and lay on the couch, appearing to go to sleep. Ms. Mitchell said that, after a while, she pretended she was taking her dog outside, went to a neighbor's house, and telephoned 911.
 {¶ 11} Two police officers responded to Ms. Mitchell's 911 call. They testified that, when they arrived at her house, they found her outside. They also testified to having seen red marks on her arm and face and a bruise on her side. They identified photographs they had taken of her injuries. The officers entered the home and found Mr. Solomon lying on the couch. Although he appeared to be asleep, he was holding a lit cigarette. The officers attempted to rouse him, but he did not respond, even after one of them blew a whistle. When one of the officers began placing handcuffs on him, he immediately reacted and began resisting. The other officer sprayed him with pepper spray, but he continued to resist, attempting *Page 6 
to tackle the officer who had sprayed him. At that point, the other officer used his Taser on him. The officer discharged his Taser three times before he and his partner were able to bring Mr. Solomon under control and finish putting handcuffs on him. They then arrested him.
 MR. SOLOMON'S WITNESSES REGARDING MS. MITCHELL'S REPUTATION FOR BEING UNTRUTHFUL {¶ 12} Mr. Solomon's defense was that Ms. Mitchell had made up the story about him beating her because she had learned that he had gotten another woman pregnant. As support for this defense, he attempted to call three witnesses who, according to him, would have impeached Ms. Mitchell by testifying that she has a reputation for being untruthful. His first assignment of error is that the trial court incorrectly prohibited him from presenting the testimony of those proffered witnesses.
 {¶ 13} The trial court permitted voir dire of the three witnesses before ruling they would not be allowed to testify regarding Ms. Mitchell's alleged reputation for being untruthful. Mr. Solomon has argued that the trial court should have allowed them to testify.
 {¶ 14} Rule 608 of the Ohio Rules of Evidence permits two kinds of evidence regarding a witness's character for truthfulness or untruthfulness: opinion testimony and reputation testimony. Although, at one point during the voir dire of one of the three proffered witnesses, that witness said something that could be interpreted as a statement that she had an opinion regarding whether Ms. *Page 7 
Mitchell was an untruthful person, Mr. Solomon did not argue to the trial court and has not argued to this Court that that witness should have been permitted to testify regarding her opinion. Rather, his argument to both the trial court and this Court has been limited to an assertion that the witnesses should have been permitted to impeach Ms. Mitchell by testifying that she has a reputation for being untruthful. This Court's analysis, therefore, is limited to whether the trial court abused its discretion by prohibiting the three proffered witnesses from testifying regarding Ms. Mitchell's alleged reputation for being untruthful.
 {¶ 15} Before a witness is permitted to impeach another witness by testifying that the witness to be impeached has a reputation for being untruthful, the proponent of the impeaching witness must establish that the impeaching witness is in a position to know the reputation of the witness to be impeached. The impeaching witness must live in, do business in, or have some other relationship with the community in which the witness to be impeached lives. Radke v. State, 107 Ohio St. 399, syllabus paragraph one (1923). The critical issue is not whether the impeaching witness knows the person to be impeached, but rather whether the impeaching witness has had sufficient contacts with the community to know the reputation for truthfulness of the person to be impeached.City of Columbus v. Puckett, 10th Dist. No. 89AP-75, 89AP-76,1989 WL 85668, *2 (Aug. 1, 1989). *Page 8 
 {¶ 16} The first proffered witness testified that she had spent two months in a battered women's shelter with Ms. Mitchell and had lived near her on the west side of Akron for a little over a year after that. In regard to common acquaintances, she testified that she knew "a few other females" from the shelter who knew Ms. Mitchell. In addition, she testified that she knew Mr. Solomon and "[t]here's a guy named Mike, Jimmy." She also testified that she and Ms. Mitchell went to a couple of bars together. When the witness was asked if she was involved in any community groups, she responded that she was not. She also acknowledged that she did not attend church with Ms. Mitchell.
 {¶ 17} The second proffered witness was the family friend who had accompanied Mr. Solomon's mother to Ms. Mitchell's house on the day of the alleged beating. He too testified that he had known Ms. Mitchell for a little over one year, including living at her house for a month and a half to two months. He initially testified that the only people he knew who also knew Ms. Mitchell were Mr. Solomon, Mr. Solomon's mother, and Mr. Solomon's uncle. He later testified that he knew other people who knew Ms. Mitchell's name, but that he did not know their relationship with her.
 {¶ 18} The third proffered witness was the woman who claimed to be carrying Mr. Solomon's baby. She testified that she had known Ms. Mitchell about six months. While Ms. Mitchell lived on the west side of Akron, this witness lived on the east side. The witness said she was "in a relationship" with *Page 9 
Mr. Solomon. In addition to Mr. Solomon, the only people she knew who also knew Ms. Mitchell were "a couple of guys." She stated that she did not know their names, only their "street names."
 {¶ 19} The proffered witnesses' contacts with the community in which Ms. Mitchell lived were extremely limited, essentially consisting of knowing Mr. Solomon, members of his family, and two or three other people. In view of their limited contacts with the community in which Ms. Mitchell lived, the trial court did not abuse its discretion by determining that they would not be permitted to testify about her alleged reputation for being untruthful. Mr. Solomon's first assignment of error is overruled.
 THE 911 CALLS ON THE DAY OF THE ALLEGED BEATING {¶ 20} At the beginning of Mr. Solomon's trial, the prosecutor told the trial court that she intended to introduce a tape recording of Ms. Mitchell's telephone call to the 911 operator on the day of the alleged beating. According to the prosecutor, Mr. Solomon, through his lawyer, had stipulated that the recording was admissible under the business record exception to the hearsay rule:
 [THE PROSECUTOR]: Your Honor, it's my understanding there's a stipulation to the 911 call as being a business record. I was informed of that last week by [Mr. Solomon's lawyer], and I did call off the witness, [the records custodian], in reliance upon that.
Mr. Solomon's lawyer, however, told the court that his agreement that the call from the day of the alleged beating was admissible was conditioned upon the State *Page 10 
agreeing to the admission of a recording of a 911 call Ms. Mitchell had made six days earlier after a fight with the woman Mr. Solomon had allegedly gotten pregnant. The prosecutor denied that Mr. Solomon's lawyer's agreement had been conditional.
 {¶ 21} The trial court stated that Mr. Solomon's lawyer had indicated to it in chambers that there was a stipulation, and Mr. Solomon's attorney repeated that his agreement had been conditional. The trial court, however, stated that it had not heard him include a condition:
 THE COURT: I didn't hear that. What I heard was a stipulation as to admissibility.
 [MR. SOLOMON'S LAWYER]: Of all the 911 calls?
 THE COURT: You didn't say that.
 [THE PROSECUTOR]: It was not made conditional.
 [MR. SOLOMON'S LAWYER]: That's what I'll stipulate to. Otherwise, no stipulation.
 {¶ 22} During Ms. Mitchell's testimony, the prosecutor began questioning her about her calls to the 911 operator on the day of the alleged beating, again asserting that there had been a stipulation that the recording of the calls was "a business record." Mr. Solomon's lawyer again stated there was no stipulation, and there was another discussion outside the presence of the jury. That discussion ended with the court stating that Mr. Solomon's lawyer had stipulated and that the State could play the recording of the calls. *Page 11 
 {¶ 23} After the prosecutor played the recording, Ms. Mitchell identified her voice. During the first call, Ms. Mitchell told the operator that her boyfriend had beaten her, that she had escaped from the house and gone next door, and that he was still in the house. She made the second call while she was waiting for police to arrive. She reiterated that Mr. Solomon had beaten her, that she had escaped, and that he was still in the house. She was sobbing slightly during both calls.
 {¶ 24} At the close of the State's case, the State offered the recording of the telephone calls from the day of the alleged beating into evidence. Mr. Solomon again objected, saying he had not stipulated to its authenticity and the State had failed to prove it. At that point, the trial court allowed the State to voir dire the records custodian outside the presence of the jury. Remarkably, the State only questioned the custodian regarding what she claimed to know about the supposed stipulation and failed to ask questions that would have been necessary to attempt to establish either the authenticity of the recording or a foundation for its introduction as a business record. Mr. Solomon's second assignment of error is that the trial court incorrectly received into evidence the recording of the calls from the day of the alleged beating.
 {¶ 25} Initially, this Court notes that Ms. Mitchell's voice on the recording was not within the business record exception to the hearsay rule found in Rule 803(6) of the Ohio Rules of Evidence. She did not make the statements on the *Page 12 
recording under a business duty to be accurate, and, therefore, her statements were not "business records." See State v. Barron, 10th Dist. No. 99AP-59, 2000 WL 739427, *3 (June 8, 2000); State v. Johnson, 2d Dist. No. 15253, 1996 WL 200623, *4 (Apr. 26, 1996). Mr. Solomon, however, did not argue to the trial court and has not argued to this Court that the recording would not have been admissible under Rule 803(6) if the State had provided evidence that it was authentic. Rather, his argument has been that he did not stipulate that the State did not have to prove its authenticity.
 {¶ 26} When a stipulation is "filed with and accepted by the court," it is binding on the parties and one of the parties cannot withdraw from it unless the court grants leave for it to do so for "good cause."Marysville Newspapers Inc. v. Delaware Gazette Co. Inc., 3d Dist. No. 14-06-34, 2007-Ohio-4365, ¶ 35 (citing Albertson v. Ryder, 11th Dist. No. 91-L-103, 1992 WL 192454 (June 30, 1992)). Unless a stipulation is made on the record in open court, it is "filed" with the court by filing a document evidencing it with the clerk of court or, if the judge permits, with the judge. See Rule 12(B) of the Ohio Rules of Criminal Procedure. In this case, no stipulation was made on the record in open Court and there was no document evidencing the supposed stipulation. Mr. Solomon's lawyer objected to the State's representation that he had unconditionally stipulated to the admissibility of the recording of the calls from the day of the alleged beating at every opportunity he had. This Court concludes that the trial court erred by *Page 13 
receiving the recording into evidence based upon a supposed stipulation that had not been "filed" with the court.
 {¶ 27} Rule 52(A) of the Ohio Rules of Criminal Procedure provides that an error that "does not effect substantial rights shall be disregarded." Ms. Mitchell testified at Mr. Solomon's trial and described in detail the alleged beating, the fact that she left the house by pretending that she was taking her dog outside, and that she went to a neighbor's house and called 911. Both responding police officers testified and recited what Ms. Mitchell had told them about the alleged beating. Although Mr. Solomon objected based on hearsay as the first officer began to recite what Ms. Mitchell had told him, the trial court overruled that objection and Mr. Solomon has not assigned error to it having done so. He did not even object to the second officer's recitation. In addition, both an emergency physician who treated Ms. Mitchell and a nurse employed by the hospital unit that cares for victims who have experienced violence testified that Ms. Mitchell told them she had been assaulted by her boyfriend. Mr. Solomon's only objection to the question to the physician about whether Ms. Mitchell had said who had assaulted her was that it was leading. The question was not leading, and the trial court overruled the objection. He did object when the prosecutor asked the nurse whether Ms. Mitchell had said who her assailant was, but the trial court overruled that objection. Again, Mr. Solomon has not argued on appeal that either the *Page 14 
physician or nurse should have been prohibited from reciting Ms. Mitchell's identification of Mr. Solomon as her assailant.
 {¶ 28} The prosecutor's playing of Ms. Mitchell's calls to the 911 operator allowed the jury to hear Ms. Mitchell's story for the sixth and seventh times. This Court concludes that the trial court's receipt of the recording of the calls was harmless beyond a reasonable doubt. Mr. Solomon's second assignment of error is overruled.
 THE OTHER 911 CALL {¶ 29} As discussed above, the argument about whether Mr. Solomon had stipulated to admission of the recording of the 911 calls from the day of the alleged beating was centered on whether the State would agree to admission of a 911 call Ms. Mitchell had placed six days earlier, following a fight between Ms. Mitchell and the woman who claimed she was carrying Mr. Solomon's baby. Mr. Solomon claimed that call was evidence that Ms. Mitchell had suffered at least some of the injuries she claimed Mr. Solomon had caused during the fight, rather than during the alleged beating.
 {¶ 30} During Mr. Solomon's case, his lawyer said that he wanted to call the 911 records custodian to attempt to establish the authenticity of the recording of Ms. Mitchell's 911 call following the fight. At that point, the prosecutor stipulated to the authenticity of the tape, but objected to its relevance. The trial court ruled that Mr. Solomon could not play the recording for the jury because it *Page 15 
was irrelevant. Mr. Solomon's third assignment of error is that the trial court incorrectly prohibited him from playing the recording for the jury.
 {¶ 31} Mr. Solomon failed to proffer the recording of the 911 call following the fight and, as a result, that recording is not part of the record on appeal. Even if this Court could conclude that the trial court erred by prohibiting Mr. Solomon from playing that call for the jury, therefore, it would be impossible for it to conclude that Mr. Solomon was prejudiced by that error. Without knowing what was on the recording, this Court cannot determine whether playing it for the jury would have assisted Mr. Solomon's defense.
 {¶ 32} Mr. Solomon has also included, as part of his argument in support of his third assignment of error, a list of 18 questions his lawyer asked Ms. Mitchell on cross-examination to which the trial court sustained objections. His argument regarding those questions consists of two sentences:
 The trial court improperly prohibited Appellant from asking the victim numerous questions on cross-examination whether, in fact, the victim was lying, was biased against Appellant, or had a defect of capacity to remember or observe the facts in question. Appellant's right to a fair trial was violated since he could not fully question and examine the victim's reasons for testifying against Appellant, or at the very least, that she was biased against Appellant in numerous ways.
In view of the fact that Mr. Solomon has failed to separately analyze the 18 questions about which he has complained and explain how they relate to showing that Ms. Mitchell "was lying," "was biased against" him, or "had a defect of capacity to remember or observe the facts in question," this Court declines to *Page 16 
undertake such an analysis on its own. Rule 16(A)(7) of the Ohio Rules of Appellate Procedure requires an appellant to make an argument containing his contentions with respect to each assignment of error "and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record" on which he relies. Mr. Solomon's argument regarding these 18 questions simply does not measure up. His third assignment of error is overruled.
 IMPEACHMENT OF THE POLICE OFFICER {¶ 33} As mentioned previously, both of the responding police officers testified at Mr. Solomon's trial. On cross-examination of the second officer, Mr. Solomon's lawyer asked whether that officer worked with "the prosecutor's husband at the Akron Police Department." The prosecutor objected, and the trial court sustained that objection, even after Mr. Solomon's lawyer pointed out that it went to the officer's credibility. Subsequently, the trial court instructed the jury to disregard the question and to "not consider it for any purpose." It said that the question was "stricken from the record."
 {¶ 34} Under Rule 616(A) of the Ohio Rules of Evidence, "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Mr. Solomon's lawyer's question to the officer was appropriate under Rule 616(A), and the trial court incorrectly sustained the State's objection to it. That error, however, does not lead to reversal of Mr. Solomon's convictions. *Page 17 
 {¶ 35} Both officers recited what Ms. Mitchell had told them regarding the alleged beating. As mentioned previously, her story was in the record seven times. This Court concludes that the trial court's refusal to allow proper impeachment of one of the officers would not have materially affected the jury's finding beyond a reasonable doubt that Mr. Solomon had beaten Ms. Mitchell and, therefore, was guilty of violating Section 2919.25(A) of the Ohio Revised Code by committing domestic violence, a felony of the fourth degree. That conviction essentially turned on Ms. Mitchell's credibility and the photographs of her injuries. She testified and the jury was able to directly assess her credibility.
 {¶ 36} The jury, however, also found Mr. Solomon guilty of violating Section 2921.33(A) of the Ohio Revised Code by resisting arrest, a misdemeanor of the second degree. The only evidence supporting the resisting arrest conviction was the testimony of the two officers. The officers' credibility, therefore, was critical to that conviction. Mr. Solomon's appeal from that conviction, however, is moot.
 {¶ 37} The trial court sentenced Mr. Solomon to 18 months in the Ohio Department of Rehabilitation and Corrections on the domestic violence conviction and 90 days in the Summit County Jail on the resisting arrest conviction, to be served concurrently. He received credit for 180 days he spent in jail as of the date of his sentencing. In effect, his sentence for resisting arrest was completed before it was imposed. *Page 18 
 {¶ 38} This Court has held that an appeal from a criminal conviction is moot if the defendant completes the sentence and "no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction." State v. Tran, 9th Dist. No. 22910,2006-Ohio-4463, at ¶ 39 (quoting State v. Berndt, 29 Ohio St. 3d 3, 4
(1987)). In In re S.J.K. 114 Ohio St. 3d 23, 2007-Ohio-2621, the Ohio Supreme Court held that a juvenile's appeal from a traffic offense was not moot, even though he had already paid his fine and court costs, because four points had been entered on his permanent driving record based on the violation. Unlike the defendant in Berndt, the juvenile inS.J.K. raised the collateral disability before the appellate court, in opposition to the State's motion to dismiss his appeal, although he did not present any evidence in support of his argument. The State agreed that the points had been assessed. The Supreme Court concluded that the juvenile had sufficiently raised collateral disability.
 {¶ 39} In this case, the State argued in its appellee's brief that Mr. Solomon's appeal of his resisting arrest conviction was moot. Mr. Solomon did not raise collateral disability in a reply brief. This case, therefore, is distinguishable from S.J.K. Mr. Solomon's appeal from his resisting arrest conviction is moot. His fourth assignment of error is overruled. *Page 19 
 CONCLUSION {¶ 40} Mr. Solomon's assignments of error are overruled. The judgment of the Summit County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to appellant. *Page 20