[Cite as *State v. Hall*, 2016-Ohio-7301.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103788**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JOHN F. HALL

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-579817-A

**BEFORE:** Stewart, J., Jones, A.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** October 13, 2016

**ATTORNEY FOR APPELLANT**

Michael B. Telep
4438 Pearl Road
Cleveland, OH 44109


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

Matthew E. Meyer
James A. Gutierrez
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

MELODY J. STEWART, J.:

{¶1} Defendant-appellant John Hall was tried and convicted by a jury of obstructing justice and tampering with evidence. He directly appeals those convictions by raising three assignments of error arguing that: 1) there was insufficient evidence to convict him of tampering with evidence; 2) the court erred by allowing improper impeachment questioning at trial; and 3) the court erred in granting the state's pretrial motion in limine. For the reasons that follow, we affirm.

{¶2} In 2013, Hall was charged in a four count, secret indictment with obstructing justice, tampering with evidence, bribery, and intimidation of a crime victim or witness. All charges in the indictment stemmed from Hall's alleged interference with an FBI raid on a local convenience store suspected of food stamp fraud, and date back to the spring of 2010 when Hall was working as a Cleveland police officer. In total, sixteen witnesses testified at trial — which included 13 state witnesses and three defense witnesses, one of whom was Hall. Following trial, the jury returned a verdict of not guilty on the bribery and witness intimidation counts but found Hall guilty of obstructing justice and tampering with evidence. The court sentenced Hall to a six-month prison term on the obstructing justice count to be served concurrent with an 18-month prison term on the tampering with evidence count.

{¶3} A summary of the relevant facts and evidence elicited at trial shows that in 2010, Hall was working as a Cleveland police detective in the fourth district's vice unit.

Hall had been a member of the Cleveland police force since the early 1990s, and had spent his entire time on the force stationed at the fourth district. During his tenure with the Cleveland police, Hall came to be acquainted with certain members of the Salti family who owned numerous grocery and convenience stores throughout the fourth district. Hall and Mousa Salti were friends and Hall became acquainted with other family members by virtue of this friendship. Mousa Salti owned the Little Eagle grocery store, which was located in close proximity to the fourth district's headquarters, until his death in 2009. Following Mousa's death, Hall remained on friendly terms with Mousa's brother, Issa Salti, and other individuals who worked at Little Eagle.

{¶4} Around this same time period, Hall's detective duties involved assisting a United States Department of Agriculture ("USDA") agent who was investigating potential food stamp fraud at numerous grocery stores located in the fourth district. Hall helped the agent by providing the agent with a confidential informant ("CI") who, while wired, would attempt to conduct illegal food stamp transactions at the stores that the agent had identified based on suspicious food stamp activity. Hall supervised many of these attempted transactions by watching undercover from the CI's car in the parking lot of the store, while the agent would watch and listen to the wire with other officers from a discreet location nearby. Although Hall was present at many of the attempted buys, he was not present at all of them.

{¶5} Initially when the agent started working closely with Hall in 2009, the agent had identified 10-15 stores within the area that were flagged for suspicious operations.

The list would eventually expand to over 20 stores and included the name of the stores, their owners, and their locations. One of the stores on the list was the Little Eagle grocery store owned by Mousa Salti. The agent testified that the CI made five different attempts at conducting an illegal food card transaction at the store, but was successful on only one of those occasions. The occasion in which the CI was successful was also the only attempt in which Hall was not present in watching from the CI's vehicle. However, the agent testified that Hall was present during many successful fraudulent transactions at other locations. During the attempts at the Little Eagle store, Hall never disclosed his friendship with Mousa Salti to the agent.

{¶6} Eventually, the agent came to learn that Salti Salti, another brother, was operating a grocery store called Superior Sunoco in the area. The agent knew Salti Salti from a previous case in which he investigated Salti for food stamp fraud in Akron, Ohio. The agent believed that Salti was once again conducting illegal food stamp transactions at the Superior Sunoco after surveying the store's food stamp transaction data and learning from other informants that the store would give cash for cards. Although Salti was on probation at the time, he was able to get food stamp servicer status because he was not listed as the official store owner and his wife filled out the servicer application in her name.

{¶7} The agent, through the CI, made ten successful fraudulent transactions at the Superior Sunoco, the last transaction being a cash-for-card transaction performed by Salti. The agent explained at trial that although food stamp fraud includes selling unpermitted

items, such as alcohol and tobacco products to individuals paying with their EBT cards,[1] the most egregious form of the offense is when retailers give out cash for cards. Under this scenario, the retailer gives cash for less than the amount available on the card but keeps the card until the funds can be debited in a manner that is not suspicious. The retailer then keeps the debited amounts. After the cards have been depleted, individuals retrieve their cards and the cycle can begin again when the card is credited with funds the next month. As explained by the agent, once a particular establishment is caught for giving out cash, the store can permanently lose its food stamp servicer status. Because of this, it is usually a big break in an investigation when a CI is able to secure a fraudulent cash transaction.

{¶8} Hall was not aware that the agent was investigating Superior Sunoco when the CI made the fraudulent purchases. In fact, Hall did not find out about Superior Sunoco until May 11, 2010, the day of the cash transaction, when the agent contacted Hall following the transaction to discuss obtaining a search warrant for the store. The agent testified that he explained to Hall that he wanted to secure a search warrant quickly because he had enough evidence on Salti and wanted to charge Salti in another case

---

[1] EBT stands for "Electronic Benefit Transfer." The card, which is used in all 50 states, allows a recipient of government benefits to authorize a transfer of funds from a federal account to a retailer, in exchange for products purchased. United States Department of Agriculture Food and Nutrition Service, *General Benefit Transfer Information*, http://www.fns.usda.gov/ebt/general-electronic-benefit-transfer-ebt-information (accessed October 6, 2016).

before he came off of probation. At the time the agent spoke with Hall about the warrant, he was still unaware of Hall's acquaintance with the Salti family.

{¶9} When the CI returned to the Superior Sunoco the next day to retrieve his EBT card as Salti had instructed, Salti was not there. On May 14, 2010, the CI went to the Superior Sunoco again to retrieve the card, this time Salti was there but told the CI that his card had been thrown out. The CI was able to retrieve the card from the dumpster behind the store, along with another individual's EBT cards.

{¶10} According to the agent, this was the first time in his years of working for the USDA as an agent that he has encountered a situation where a store threw out EBT cards. The agent became concerned that Salti had been tipped off about the investigation in some way. According to the agent, he was afraid that perhaps the CI's card had been flagged or that the CI had been recognized in the community because of the numerous other buys at nearby stores. After further investigation, the agent learned from a Superior Sunoco employee that Salti had been made aware of the investigation by a person named Johnny. According to the employee, Johnny knew that the store was being investigated and that the agent wanted to secure a charge against Salti before he came off of probation.

{¶11} Because of the specificity of the information, the agent immediately zeroed in on the conversation he previously had with Hall about securing the search warrant. The agent's first instincts were that Hall had briefed other members of the police force on the impending warrant and that one of those officers leaked the information. The agent

approached Hall about this theory, but Hall maintained that he had not disclosed anything about the investigation.

**{¶12}** Notwithstanding his concern that Salti had been tipped off, the agent obtained a search warrant. Hall assisted the search warrant process by organizing Cleveland police officers to be present in marked vehicles during the FBI search. Hall was present during the search and asked to be present while the agent interviewed Salti on the premises — which seemed strange to the agent. According to the agent, Salti got agitated and began banging his handcuffed hands against his head when asked during the interview whether he was tipped off. Salti said he was not tipped off. Despite conducting an extensive search of the premises, the FBI agents were unable to uncover any evidence of food stamp fraud. The agent testified that normally when CIs conduct numerous fraudulent transactions with EBT cards and insider employees say that fraud is taking place, he would expect to find logs of transactions, EBT cards, financial statements, or other information on the premises indicating food stamp fraud. In this instance, he found nothing.

**{¶13}** Immediately following the search, Salti was arrested on a previously secured arrest warrant stemming from his illegal cash-for-card sale to the CI. While being held pending charges at the county jail, Salti had his attorney contact the agent to say that Salti wanted to talk to him. The agent organized an interview during which Salti told the agent that the tip came from Hall. According to the agent, Salti was not offered anything for his cooperation, but disclosed Hall's tip voluntarily.

{¶14} At trial, Issa Salti testified that he had known Hall for many years because Hall would often frequent the Little Eagle Food Mart where he worked. Issa informed the court that he considered Hall a friend. Issa then testified that in May 2010, Hall came into the Little Eagle store and asked for his cell phone number. Issa wrote it down and gave it to him. Hall said nothing and walked out of the store. According to Issa, about 15 minutes later, Hall called him to ask whether he knew who owned the Superior Sunoco station. Issa told Hall that the owner was his brother Salti. At that point, according to Issa's testimony, Hall told him "what is going on over there needs to stop." When Issa asked what he meant by that, Hall told him that there was illegal activity going on and that the activity included illegal EBT sales. Issa also testified that Hall made it clear to him that the illegal activity at the Superior Sunoco needed to stop very soon because the police were going to show up there and said that "things needed to get cleaned up." Following his conversation with Hall, Issa called Salti and another brother.

{¶15} Salti corroborated Issa's testimony at trial and confirmed that he first received Hall's tip about the investigation by way of Issa in a phone call. Salti further testified that because he did not know Hall that well, he had his brother-in-law, Jamal Hanini — who, according to Salti, was better acquainted with Hall because he also worked at Little Eagle — call Hall to confirm the information. According to Salti, he spoke with Hanini later that night (the implication being after Hanini spoke to Hall) about the tip and after that conversation he knew that he had to go clean up his store.

Specifically, he knew that he had to get rid of all food stamp cards, throw away any suspicious receipts, and essentially leave no trace of food stamp fraud behind.

{¶16} Hall took the witness stand in his own defense. He testified regarding his friendship with Mousa Salti and how he worked as a police detective with the USDA agent investing food stamp fraud. Hall testified that he did not disclose his relationship with the Salti family to the agent because he did not think it mattered. He further testified that he did get Issa's cell phone number and called him to see if he had any knowledge about the owner of the Superior Sunoco. Hall explained that Issa told him that his brother Salti owned and operated the store. According to Hall, when Issa asked why he was inquiring, Hall just said that he wanted to know and that, with no intentions to undermine the investigation, indicated to Issa that "something's going on." Hall testified that was the end of their conversation and that he only asked about the owner because he was curious to know if Salti Salti was related to Issa's family. Hall said that he never told Issa that things needed to be cleaned up, or that there was a current investigation into food stamp fraud that would result in an imminent search of the Superior Sunoco.

{¶17} In his first assigned error, Hall contends that the trial court erred in denying his Crim.R. 29 motion for acquittal on the tampering with evidence charge on the basis that the state failed to present sufficient evidence of every element of the offense. Specifically, Hall argues that the state failed to show that he had the specific intent to

alter, destroy, conceal, or remove the evidence of food stamp fraud, or that he was complicit in the act of tampering with evidence. We disagree.

{¶18} Pursuant to Crim.R. 29(A), a trial court may order a judgment of acquittal either at the close of the state's case or the close of all evidence, if it finds that the state failed to present sufficient evidence of the elements of the offense charged. However, a trial court "'shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.'" *State v. Williams*, 8th Dist. Cuyahoga No. 103257, 2016-Ohio-5403, ¶ 22, quoting *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. And "[a] motion for judgment of acquittal under Crim.R. 29 should only be granted where reasonable minds could not fail to find reasonable doubt." *Id.,* citing *State v. Apanovitch,* 33 Ohio St.3d 19, 23, 514 N.E.2d 394 (1987), citing *Bridgeman.*

{¶19} Appellate courts review the denial of a Crim.R. 29 motion for acquittal under the same test used for reviewing a challenge to the sufficiency of the evidence at trial. *Id.* at 23, citing *State v. Turner*, 8th Dist. Cuyahoga No. 88489, 2007-Ohio-5449, ¶ 72. The test requires that the appellate court examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *State v. Smith*, 8th Dist. Cuyahoga No. 103483, 2016-Ohio-5512, ¶ 39, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A reviewing court is not to

assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶20} Tampering with evidence in violation of R.C. 2921.12(A)(1) provides that:

No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(A) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

{¶21} The three elements of this offense are: 1) having the knowledge of an official proceeding or investigation in progress or likely to be instituted; 2) the alteration, destruction, concealment, or removal of the potential evidence; and 3) having the purpose of impairing the potential evidence's availability or value in such proceeding or investigation. *State v. Straley*, 139 Ohio St.3d 339, 11 N.E.3d 1175, 2014-Ohio-2139, ¶ 11. The mens rea element of the offense requiring that the person act "purposely," has been interpreted to mean that the person has the specific intention to cause a certain result. *State v. Sharp*, 8th Dist. Cuyahoga No. 103445, 2016-Ohio-2634, ¶ 19; R.C. 2901.22(A). "When determining whether the defendant acted purposely, a defendant's state of mind may be inferred from the surrounding circumstances." *Id.,* citing *State v. Rock*, 3d Dist. Seneca No. 13-13-38, 2014-Ohio-1786, ¶ 13.

{¶22} At trial, Hall adamantly denied having any purpose in contacting Issa beyond that of being curious about whether the owner of Superior Sunoco was related to

the members of the Salti family that he knew. Nevertheless, there is more than enough evidence from the surrounding circumstances and testimony of the state's witnesses for the jury to find that Hall acted purposely with the intention of impairing potential evidence when he contacted Issa. First, the state presented ample evidence of Hall's relationship with the Salti family going back to the late 1990s. Several of the Salti family members, including Issa, regarded Hall as a friend, and such friendships could be viewed by the jury as a motive for disclosing the information. Furthermore, Issa testified that Hall told him that things needed to be "cleaned up" at the Superior Sunoco because the police would be coming. Although Hall denies making this statement, the statement alone, if believed, is sufficient to support a finding that Hall acted purposely to ensure that evidence of the food stamp fraud would be altered, destroyed, concealed, or removed. Moreover, the fact that Hall did not physically alter, destroy, conceal, or remove the evidence himself is of no consequence. If Issa and Salti's statements at trial are to be believed, then Hall knowingly gave Salti information that encouraged Salti to get rid off the evidence of food stamp fraud from the store, and Salti acted upon it. Accordingly, a jury could find Hall was complicit in the destruction of evidence by knowing that the destruction was likely to happen. Accordingly, we overrule the assigned error.

{¶23} In his second assignment of error, Hall argues that the trial court committed reversible error when it permitted the state, over objection, to impeach Hall's testimony with specific acts evidence not relevant to Hall's character for truthfulness.

**{¶24}** Ohio Evid.R. 608 governs how parties may attack witness credibility. Specifically, section (B) explains when a party can impeach a witness with specific instances of misconduct (noncriminal convictions) in order to attack the witness's character for truthfulness. This section states in relevant part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *.

*Id.*

**{¶25}** The decision whether to admit prior witness misconduct for impeachment purposes under Evid.R. 608(B) is within the sound discretion of the trial court. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 100, citing *State v. Boggs*, 63 Ohio St.3d 418, 424, 588 N.E.2d 813 (1992). However, the court must be mindful that evidence of prior bad acts should only be admitted where the evidence is *clearly probative of truthfulness or untruthfulness. Accord Drummond* at ¶100-102; *see* Evid.R. 608. Generally, prior bad acts that do not involve instances of dishonesty, are not clearly probative of truthfulness. *See State v. Tolliver*, 16 Ohio App.3d 120, 474 N.E.2d 642 (8th Dist.1984) (explaining that, "[o]nly matters which are relevant to truth and veracity, and not to a witness's general moral character, are the proper subject of cross-examination" and "[p]articular facts which tend to discredit the reputation of a

person who is sought to be impeached in other respects than as to his reputation for truth and veracity are inadmissible.").

{¶26} A review of the state's cross-examination shows that the prosecution, from the second question onward until several transcript pages into the examination, asked Hall a barrage of questions regarding his prior bad acts, aimed at diminishing Hall's credibility. The prosecutor began the examination by commending Hall on some of the accolades he received during his years on the police force, but then said, quite pointedly, "but then on the other side, you've been in a little bit of trouble, have you not, with your conduct?" before launching into a series of questions — which at times were not questions at all but rather statements made by the prosecution — about Hall's noncriminal behavior. All questions were objected to by defense counsel in turn, and overruled by the court. Accordingly, the state was allowed to ask Hall whether he hit somebody during a bar fight, whether he was uncooperative with officers responding to that bar fight, whether he encountered police officers while being intoxicated and belligerent in the street, and whether he got into a second fight at a bar and again refused to identify himself to responding officers. He was further questioned about allegations of menacing and an allegation of domestic violence. Finally, he was asked about whether he showed up to grand jury proceedings "without the right papers," and instances of being disciplined by the police force for unauthorized secondary employment and for wearing a mask at a search warrant.

{¶27} None of these instances, maybe with the exception of the unauthorized employment, reflect on Hall's character for truthfulness. Accordingly, the court should have sustained defense counsel's objections and prevented the state from questioning Hall on these acts.

{¶28} Although the state contends on appeal that Hall opened the door to the questioning by discussing how long he has been a police officer, the well-intentioned reasons for why he became an officer and the awards he has received as an officer, as well as his calling another member of the police force to testify favorably about him, does not allow the state to introduce noncriminal evidence of prior bad acts on cross-examination to impeach him. Unless the prior acts clearly show Hall's character for untruthfulness, or directly contradict some statement that he made about himself, they should not be allowed into evidence.

{¶29} Nevertheless, we have to conclude that the court's error in admitting the evidence did not prejudice Hall, and is therefore harmless. *See Ryerson v. White*, 8th Dist. Cuyahoga No. 100547, 2014-Ohio-3233, ¶ 43 (a trial court error involving the admission of evidence that does not affect a substantial right, does not prejudice the defendant at trial, is not reversible error). Here, the evidence against Hall was overwhelming. The state produced 13 witnesses who testified against Hall, with the three most prominent witnesses — the agent, Issa, and Salti — giving detailed descriptions of their conversations and interactions with Hall, that implicate him

considerably in the crimes for which he was convicted. We therefore overrule this assigned error.

{¶30} In his final assignment of error, Hall contends that the trial court erred by granting the state's motion in limine which prevented him from calling certain law enforcement witnesses to impeach Salti's credibility. This assignment of error is not well taken.

{¶31} Although Evid.R. 608(A) allows a party to call a character witness to testify that another witness (the target witness) has a bad reputation for truthfulness, or that he (the character witness) has a low opinion of the target witness's character for truthfulness, the decision whether to allow a character witness to testify is within the sound discretion of the trial court. *See State v. Solomon*, 9th Dist. Summit No. 23545, 2008-Ohio-553, ¶ 14. Generally, before a court will allow a character witness to testify about the reputation of another witness, the proponent of the impeaching witness must show that the impeaching witness is in a position to know the reputation of the witness to be impeached. *Id.* "The impeaching witness must live in, do business in, or have some other relationship with the community in which the witness to be impeached lives." *Id.,* citing *Radke v. State*, 107 Ohio St. 399, 140 N.E. 586, (1923), paragraph one of the syllabus. All of the impeaching witnesses that Hall wanted to call were law enforcement officials. Thus, the witnesses' opinions of Salti were formed through their run-ins with him as a criminal. Accordingly, it cannot be said that these witnesses had a general

understanding of Salti's reputation for truthfulness in the community. We therefore cannot say that the court abused its discretion in granting the motion in limine.

{¶32} Additionally, Hall had a chance to extensively cross-examine Salti about his many criminal convictions, including those exhibiting untruthful behavior such as his fraud convictions. Therefore, there is no reason to believe that, even had the court erred in denying the motion in limine, Hall was prejudiced by the denial.

{¶33} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MELODY J. STEWART, JUDGE

LARRY A. JONES, SR., A.J., and
MARY EILEEN KILBANE, J., CONCUR