[Cite as *State v. Williams*, 2016-Ohio-5403.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103257**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MORACE WILLIAMS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-587955-A

**BEFORE:** Kilbane, P.J., E.T. Gallagher, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** August 18, 2016

**ATTORNEY FOR APPELLANT**

Thomas E. Conway
55 Public Square
Suite 2100
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Edward D. Brydle
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

**{¶1}** Defendant-appellant, Morace Williams ("Williams"), appeals from his felonious assault convictions. For the reasons set forth below, we affirm.

**{¶2}** In August 2014, Williams was charged in a 13-count indictment resulting from a shooting at an apartment complex on East 40th Street in Cleveland, Ohio. Counts 1-3 charged Williams with improperly discharging a firearm into a habitation and carried one-and three-year firearm specifications. Counts 4-13 charged him with felonious assault and carried one-and three-year firearm specifications. All of the victims named in the indictment lived in or were occupying the individual apartments at the time of the shooting. Six of the victims are children.[1]

**{¶3}** In May 2015, the matter proceeded to a jury trial, at which the following evidence was adduced.

**{¶4}** Rayleen Patterson ("Patterson") testified that on the evening of the shooting, she was at home with her children and her friend, Michael Jackson ("Jackson"). Patterson lives on East 40th Street. Her daughter, Kenyatta Grove ("Grove"), and her daughter's best friend, Tiesha Braxton ("Braxton"), were hanging out together. While Patterson was cooking dinner, Grove and Braxton came into the kitchen and told her that they were going to fight two girls. In response, Patterson told them not to fight anybody.

---

[1]In January 2016, Williams's co-assailant, Errick Shelton ("Shelton") was charged in a separate case in a 16-count indictment, consisting of three counts of improperly discharging a firearm into a habitation, ten counts of felonious assault, and three counts of vandalism. Shelton entered into a plea agreement with the state of Ohio ("state") and has not filed an appeal as of the date of this opinion.

Then, approximately two hours later Patterson heard some noise outside. She went to her front door and observed Grove and Braxton arguing with two females and two males, who were standing outside her door. One of the females, later identified as Taujahree Borich ("Borich"), stated she was there to fight Braxton. Patterson asked them to leave, stating that Braxton does not live with her. Braxton and Borich began to fight outside. Patterson eventually stopped that fight. Thereafter, she observed Grove and the other female, later identified as Williams's sister, fighting in the grass, which was closer to her apartment. Patterson eventually stopped this fight as well. The attention then shifted to the two males.

{¶5} Patterson testified that she had never seen these two males before and she could not recall what they looked like at the time of the incident. She testified that one of the males, who is also known as "Fat Man," started going "crazy," yelling and cursing. "Fat Man" was later identified as Shelton. Then, the other male, who was later identified as Williams, pulled a gun out and started shooting in the air. She further testified that Shelton told Williams to give him the gun and then Shelton started shooting. The bullets hit the housing complex. Eventually, the two girls, Williams, and Shelton got back into their vehicle and drove away from the scene. Patterson testified that Williams was the driver of the vehicle. After the vehicle turned the corner, it stopped and several more shots were fired from the vehicle. Patterson then called 911.

{¶6} Grove did not want to testify, and was declared an adverse witness upon the state's request. She testified that she knows Williams and Borich through Braxton.

Borich is Williams's girlfriend. On the day of the incident, Braxton was over Grove's house. At some point, Braxton called Borich and the two of them began arguing over the phone. The conversation ended with the idea that Borich would come over and she and Braxton would fight. When Borich arrived, she was with another female, Williams's sister, and two males, Williams and Shelton. Braxton and Borich started fighting outside. As Grove helped stop the fight, Williams's sister hit her in the head. A fight then began between Grove and Williams's sister until Patterson stopped that fight. Thereafter, Grove heard gunshots. Grove testified she did not know who fired the gunshots.

{¶7} Grove further testified that even if she viewed her statement to the police, she still would not know who fired the gunshots because Braxton helped her write her statement. Grove then read her statement to the jury. In her statement, she said that after the fighting, "Fat Man" pulled a gun threatening everyone and then gave the gun to Williams who then started shooting. The shooting continued in Grove's direction, as the four of them left in their van. Grove testified that she had previously adopted her statement as true.

{¶8} When questioned by the state, Grove admitted that while waiting to testify, she had been outside the courtroom sitting, and going to lunch with Braxton and Borich. Borich was crying outside the courtroom in the hallway about the case the previous day, and Braxton helped to console Borich. Eventually, Grove testified that she did observe the van drive away, and observed gunfire coming from the van toward her and Patterson.

She testified that Williams was driving the van and was the shooter, but then stated that she was uncertain as to who the shooter was.

{¶9} Braxton testified that on the day of the shooting, she was at Grove's home. She called Borich to see if she wanted to go out to eat. Their phone conversation ended with talk of a fight. Eventually, Williams, Shelton, Borich, and Williams's sister came to Grove's home. Braxton testified that she knows Williams because he is a family friend. She also knows Shelton through Borich.

{¶10} When the four of them arrived, Braxton and Grove went outside. Borich walked up to Braxton and they started fighting. Their fight moved towards the tree lawn in front of Grove's home. Then, Grove and William's sister began fighting. She heard Borich say "[m]ove. They got guns." Next, Braxton testified that she observed Shelton and Jackson arguing. She then ran into Grove's home. She noticed that Patterson was not inside, so she went back outside. At this point, she observed Shelton shooting at Patterson and toward the house. She testified that she never observed Williams with a gun. Braxton further testified that she was not truthful when she wrote in her statement that Williams had a gun. She lied because she was mad at Williams. Braxton also admitted that she told Grove what to say in her police statement.

{¶11} Borich testified that she is in a relationship with Williams and has a child with him. Borich and Braxton were best friends for years. On the day of the incident, Borich was with Williams, Shelton, and Williams's sister. Braxton called her and they made plans to go out to eat, but a verbal argument ensued over the phone. The four of

them then went to Grove's home, with Williams driving. Borich testified that when they arrived, she and Braxton began to fight. When they stopped fighting, Grove and Williams's sister started fighting. Thereafter, Shelton and Jackson got into an altercation. Shelton pulled out a gun and started shooting. Borich never observed Williams with a gun. She testified that Williams got into the van when the shooting occurred. Shelton was shooting at Jackson, who was running back toward the house. Williams drove the van when they left. Borich testified that there were no gunshots coming from the van as they left the scene.

{¶12} Jackson testified that he is Patterson's boyfriend. He knows her daughter, Grove, and Grove's friend, Braxton. He does not know Williams, Borich, and Shelton. At the time of the incident, Jackson heard commotion outside. He went to the front door and observed two females and two males outside, along with Grove and Braxton. He described one of the males as a "heavy-set, brown-skinned guy with a hoodie," who was later identified as Shelton. He described the other male as "a skinny dark-skinned guy." He testified that the females were fighting in two separate fights, and Patterson was trying to stop the fights.

{¶13} As he went to help Patterson stop the fights, the heavy-set male pulled a gun and told him to "move, walk away." Jackson then walked back into the house. He partially opened the front door and looked outside. He observed the skinny, dark-skinned male, who was by the tree lawn, shoot the gun one time. After the gunfire, he left the front door and went into the house. Jackson went back to the front door for a

second time and told everyone to get back in the house. There were approximately five or six gunshots fired toward the house when Jackson came to the door. Jackson testified that the heavy-set male was shooting the gun this time. Grove and Braxton ran into the house, but Patterson was scared and did not move.

{¶14} When the police arrived, Jackson stayed in his room because he had an outstanding warrant. At a later point in time, he did speak with police and was shown two photo arrays. He was able to identify Shelton in one of the photo arrays. He was not able to identify anyone in the second photo array.

{¶15} Cleveland Metropolitan Housing Authority Police Officer Robert Paolucci ("Officer Paolucci") testified that he responded to the scene. He spoke with Patterson, Grove, and Braxton. He gave Grove and Braxton statements and asked them to write down what happened. He stayed with them while they each wrote their own statement. While he was with them, Officer Paolucci testified that he never observed one of the females tell the other female what to write in her statement. As part of the investigation, Patterson was shown a photo array of the suspects on two occasions, but was unable to identify either Williams or Shelton. Grove and Braxton were shown a photo array three days after the incident and both identified Williams as the shooter. Grove identified Williams as the person who "shot into the house and * * * a few times in the air and then he got in the mini van and shot * * * a few times more out of the car while pulling off." She testified at trial, however, that she picked Williams as the assailant because Braxton

instructed her to do so. Braxton testified at trial that she lied to the police when she identified Williams as the shooter because she was mad at him.

{¶16} A 911 call from an unidentified female was played for the jury. In that call, the female reported hearing five to six gunshots at Patterson's home on East 40th Street. She stated there were girls fighting and there were two males, one was light in complexion and the other had a dark-skinned complexion. The male with the dark complexion had a gun. One male was wearing a hooded sweatshirt and the other male was wearing a white t-shirt and had a beard. She heard one male tell the other male to give him the gun. As she turned around to walk away, she started hearing gunshots.

{¶17} At the conclusion of trial, the jury found Williams guilty of felonious assault, with the accompanying firearm specifications, as charged in Counts 4-13. The jury found him not guilty of improperly discharging a firearm into a habitation as charged in Counts 1-3.

{¶18} Approximately one month after the conclusion of trial, Williams filed a motion for a new trial based on newly discovered exculpatory evidence. Williams argued for a new trial based on the statements of Shelton and Jackson. Attached to his motion was an affidavit of a private investigator, who averred that he took a statement from Shelton and Jackson. He averred that Shelton's statement indicated the following: (1) Shelton never observed Williams with a gun; (2) Williams did not give him a gun; (3) he and Williams did not plan the shooting beforehand; and (4) there was no gunfire coming from the vehicle as Williams drove away from the scene. The investigator

further averred that Jackson's statement indicated the following: (1) Jackson never observed Williams with a gun, nor did he observe Williams hand a gun to anyone; (2) Jackson observed Shelton engage in all of the shooting; and (3) Jackson testified at trial that Williams engaged in the shooting because "someone else told him so." The state opposed, arguing that Williams did not produce new admissible evidence. The court held a hearing on Williams's motion. After hearing arguments from both Williams and the state, the trial court denied the motion and proceeded to sentencing.[2]

{¶19} The trial court sentenced Williams to two years in prison on each count to be served concurrently. The court merged the one-year firearm specification on each count into the three-year firearm specification on each count. The court ordered that the three-year firearm specification on Counts 4 and 5 be served prior to and consecutive with the base charge of two years on Counts 4 through 13. The court further ordered that the remaining firearm specifications be served concurrently with each other, for a total of eight years in prison. The court ordered that judicial release for Williams be considered after six years in prison.

{¶20} Williams now appeals, raising the following three assignments of error for review.

Assignment of Error One

---

[2]Williams filed a supplement to his motion for a new trial on July 1, 2015. In the supplement, he included notarized statements from Shelton and Jackson. This supplement was not before the trial court at the time of hearing.

The trial court erred in failing to grant [Williams's] motion for judgment of acquittal as to all counts of the indictment, including Counts Four through Thirteen.

## Assignment of Error Two

The jury's verdicts of guilty as to all counts of which [Williams] was found guilty were against the manifest weight of the evidence.

## Assignment of Error Three

The trial court erred in not granting [Williams's] motion for new trial based on newly discovered exculpatory evidence.

## Motion for Acquittal

{¶21} In the first assignment of error, Williams argues the court erred when it denied his motion for acquittal. Specifically, he argues there was insufficient evidence to convict him of felonious assault under the complicity theory, with Shelton as the principal offender.

{¶22} Under Crim.R. 29(A), a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. A motion for judgment of acquittal under Crim.R. 29 should only be granted where reasonable minds could not fail to find reasonable doubt. *State v. Apanovitch*, 33 Ohio St.3d 19, 23, 514 N.E.2d 394 (1987), citing *Bridgeman*.

{¶23} "The test an appellate court must apply in reviewing a challenge based on a denial of a motion for acquittal is the same as a challenge based on the sufficiency of the

evidence to support a conviction. *See State v. Bell* (May 26, 1994), 8th Dist. [Cuyahoga] No. 65356, 1994 Ohio App. LEXIS 2291." *State v. Turner*, 8th Dist. Cuyahoga No. 88489, 2007-Ohio-5449, ¶ 72. The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.
>
> In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶24} Williams was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶25} Ohio's complicity statute, R.C. 2923.03(A), provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense." A person aids

or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 245-246, 2001-Ohio-1336, 754 N.E.2d 796. "Such intent may be inferred from the circumstances surrounding the crime." *Id.* at 246.

{¶26} Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout. *Id.*, citing *State v. Trocodaro*, 36 Ohio App.2d 1, 301 N.E.2d 898 (10th Dist.1973).

{¶27} Williams argues that there is no evidence that he aided or abetted Shelton in the shooting at the apartment complex. He relies on the testimony of Groves, Braxton, and Borich, who testified that they did not observe him with a gun. He contends that Shelton implusively fired the gun at Jackson, after his confrontation with Jackson.

{¶28} While Williams attempts to separate himself from Shelton, a review of the record does not support such a finding. The record demonstrates that Williams drove himself, Shelton, his sister, and his girlfriend to Patterson's house for a fight. Williams and Shelton watched as Williams's sister and girlfriend fought with Groves and Braxton. Williams fired off a gun in the air, then handed over the gun to Shelton, who was in an

agitated state from his argument with Jackson. Both Patterson and the unidentified 911 caller described how one of the males (Shelton) asked for the gun from the other male (Williams) and started firing the gun. Patterson testified "[the gun] was in [Williams's] hands." Williams then fled the scene with Shelton, his sister, and his girlfriend. As Williams drove away, more gun shots were fired from the vehicle.

{¶29} Based on the foregoing, we conclude that any rational trier of fact could have found that Williams knowingly aided and abetted the essential elements of felonious assault. Therefore, it was not error for the trial court to deny Williams's motions for acquittal.

{¶30} Accordingly, the first assignment of error is overruled.

Manifest Weight of the Evidence

{¶31} In the second assignment of error, Williams argues that his convictions are against the manifest weight of the evidence. In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendants? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins*

at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶32}** Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

**{¶33}** We note that when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible. *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26; *see also State v. Lilliard*, 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, ¶ 93 (In considering the credibility of witnesses on a manifest weight challenge, an appellate court is "guided by the presumption" that the jury, or the trial court in a bench trial, is "'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984)). Therefore, we afford great deference to the factfinder's determination of witness credibility. *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, ¶ 36.

{¶34} Here, Williams claims the "jury lost its way" because Patterson was not credible. Specifically, he refers to her testimony, in which she stated that she did not "remember a lot of stuff" because it happened "so long ago." He also refers to her testimony that Williams gave Shelton the gun, which was contradicted by Groves, Braxton, Borich, and Jackson.

{¶35} In the instant case, the jury observed Patterson's appearance and demeanor, heard her testimony, and found it to be credible. Her testimony was further supported by the unidentified 911 caller, who stated one of the males (Shelton) asked for the gun from the other male (Williams) and started firing the gun. Moreover, Groves, Braxton, and Borich may have had an ulterior motive when testifying. Borich testified that Williams is her boyfriend and the father of her child. Groves testified that Braxton told her to write in her statement to the police that Williams was the shooter. Braxton testified that she lied to the police, telling them that Williams was the shooter, because she was upset with him.

{¶36} We are mindful that it "'[i]t is the province of the [trier of fact] to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.'" *State v. Jennings*, 10th Dist. Franklin No. 09AP-70, 2009-Ohio-6840, ¶ 56, quoting *State v. Haynes*, 10th Dist. Franklin No. 03AP-1134, 2005-Ohio-256, ¶ 24; *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387 ¶ 38. The trier of fact in this case, was in the best position to weigh the evidence and evaluate witness credibility. The jury was entitled to believe or disbelieve all, part, or none of a

witness's testimony.   After examining the entire record, we cannot say that the jury lost its way or created a manifest miscarriage of justice in convicting Williams of felonious assault.

{¶37} Accordingly, the second assignment of error is overruled.

## Motion for a New Trial

{¶38} In the third assignment of error, Williams argues the court erred when it denied his motion for a new trial.   Specifically, he contends that Shelton's and Jackson's statement by virtue of the private investigator's affidavit is new evidence, which demonstrates his actual innocence.   The state maintains that the investigator's affidavit is hearsay and lacks credibility.

{¶39} A trial court's decision to grant or deny a motion for a new trial is not subject to reversal on appeal absent an abuse of discretion.   *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990), syllabus.   "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'"   *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶40} Crim.R. 33 governs motions for a new trial and provides in pertinent part:

(A) Grounds.   A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

* * *

(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial.   When a motion for a new trial is made upon the

ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶41} To warrant the granting of a motion for a new trial in a criminal case, based on the grounds of newly discovered evidence, the new evidence must demonstrate that it:

(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. (*State v. Lopa*, 96 Ohio St. 410, approved and followed.)

*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶42} When reviewing motions for new trial, a trial court may weigh the credibility of affidavits submitted in support of the motion in determining whether to accept the affidavit as true statements of fact. *State v. Taylor*, 8th Dist. Cuyahoga No. 88020, 2007-Ohio-825, ¶ 15, citing *State v. Coleman*, 2d Dist. Clark Nos. 04CA43, 04CA44, 2005-Ohio-3874.

{¶43} In the instant case, Williams filed his motion for new trial based on newly discovered exculpatory evidence on June 25, 2015. In support of his motion, Williams attached an affidavit from a private investigator. The state filed its brief in opposition on June 30, 2015, which was the same day as sentencing. Before sentencing, the trial court held a hearing on Williams's motion.

**{¶44}** At issue, was the affidavit attached to Williams's motion. In this affidavit, the private investigator averred that he took a statement from Shelton and Jackson. He averred that Shelton's statement indicated the following: (1) Shelton never observed Williams with a gun; (2) Williams did not give him a gun; (3) he and Williams did not plan the shooting beforehand; and (4) there was no gunfire coming from the vehicle as Williams drove away from the scene. The investigator further averred that Jackson's statement indicated the following: (1) Jackson never observed Williams with a gun, nor did he observe Williams hand a gun to anyone; (2) Jackson observed Shelton engage in all of the shooting; and (3) Jackson testified at trial that Williams engaged in the shooting because "someone else told him so." The state opposed, arguing that Williams did not produce new admissible evidence. The court held a hearing on Williams's motion and found the following:

> I am looking at this, the affidavit of [the private investigator], and I'm going to take these statements as if they were provided in a separate affidavit. I'm looking at them and the merits of the statements provided by Errick Shelton and Michael Jackson.
>
> So we all know, we're here under Criminal Rule 33(A)(6). It's a motion for a new trial based on newly discovered evidence. The defense filed this motion within the required 120 day time limit, and to warrant the Court's granting of a new trial, the newly discovered evidence must at least disclose a strong probability that it will change the result if a new trial is granted. It must not be merely cumulative to the former evidence.
>
> Now this decision of whether or not to grant a new trial is based solely on the trial court's discretion, so the affidavit contained here has statements from two — one witness, one additional individual from witness Michael Jackson and the unindicted co-conspirator, Errick Shelton, so Michael Jackson's statement contradicts his trial testimony the way I see it, and he now states he never saw the defendant with a gun and that he only testified

at trial that he saw Mr. Williams with a gun because someone told him to testify to such.

Errick Shelton's affidavit, not his affidavit, but his statement in the affidavit of [the private investigator] swears that he did not plan, talk to, talk about the shooting with Mr. Williams and that Mr. Williams didn't possess a gun and never handed him a gun.

In order to satisfy the high burden set forth in *Petro*, [148 Ohio St. 505, 76 N.E.2d 370], which is cited by the defense you have to meet all the required prongs of *Petro*, and as it relates to Michael Jackson's statements in this, [the private investigator's] affidavit, I find that the newly discovered evidence to be lacking in this area.

Although the statement was made after trial, Mr. Jackson was brought into court as stated by the defense on a material witness warrant, and both the State and the defense were given the opportunity to speak with Mr. Jackson regarding his testimony prior to taking the stand.

Further, Mr. Jackson's statement in this affidavit that Mr. Williams did not possess a handgun can be considered cumulative to the testimony of Miss Borich, Miss Grove and Miss Braxton, all three of whom testified that Morace did not have a handgun on the night in question.

His affidavit, the statements in the affidavit of Mr. Jackson, contradicts his former testimony, and I do not believe they disclose a strong probability that it would change the result if a new trial is granted.

This trial was ripe with witnesses who contradicted their own prior statements as well as the statements of other testifying witnesses. It's a unique situation with Mr. Shelton[,] but I do not find it meets the required prongs of *Petro*.

Again his statement was given at the trial but his identity was known to everyone both prior to and during the trial. I know he has been avoiding or potentially avoiding detection but his identity was known. The prosecution subpoenaed him. He did not come in. The defense didn't list him as a potential witness, nor did they subpoena him or subpoena — ask this Court to bring him in as a material witness, so I can't say that due diligence was exercised in this case before trial to have him come in and make these statements.

We don't know if he would exercise his Fifth Amendment right.   I'm not going to speculate that he would or wouldn't[,] but in this case I can't say that those factors are met.

And even if he was brought in here and he testified consistent with the statements made in [the investigator's] affidavit, again it's cumulative evidence in that another person is stating that Morace Williams did not have a gun on him that night, and I can't find that that's enough or that's enough to say there is a strong probability that a new, that a different decision would be reached.

We have a very clear jury instruction that the testimony of one witness if believed is enough to prove any fact of consequence.   We're not sure exactly who the jury believed or put their weight on, but I have to consider based on everything in the verdict, that was Rayleen Patterson because she did testify that she saw the defendant.   She was right next to him and that he handed a gun to Mr. Shelton who then shot up the residence, so I cannot say that there is a strong probability that given this evidence the outcome of trial would be different, so for all those reasons I'm going to deny Mr. Williams's motion for a new trial.

{¶45} It is clear from the record that the trial court considered the *Petro* factors and the credibility of the affidavits.   In doing so, the trial court did not find that there was a strong probability that given this evidence the outcome of trial would be different.   Based on the foregoing analysis, we cannot say the trial court abused it discretion in denying Williams's motion for a new trial.

{¶46} Accordingly, the third assignment of error is overruled.

{¶47} Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having

been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
MELODY J. STEWART, J., CONCUR