[Cite as *State v. Harris*, 2023-Ohio-1892.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                              :

    Plaintiff-Appellee,            :

                                   No. 111940

    v.                                        :

JAI'SHAWN HARRIS,                     :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  June 8, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-656998-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl M. Felice, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1}  Defendant-appellant, Jai'Shawn Harris, appeals his convictions following a jury trial.  For the reasons that follow, we affirm.

{¶ 2}  In 2021, Harris was named in a six-count indictment charging him with one count of felonious assault, a second-degree felony in violation of R.C.

2903.11(A)(1) (Count 1); two counts of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(2) (Counts 2 and 3); one count of discharge of a firearm on or near prohibited premises, a first-degree felony violation of R.C. 2923.162(A)(3) (Count 4); criminal damaging or endangering in violation of R.C. 2909.06(A)(1) with a furthermore clause that enhanced the charge to a first-degree misdemeanor (Count 5); and tampering with evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) (Count 6). Counts 1, 2, 3, and 4 carried one- and three-year firearm specifications.

## I.   Jury Trial

{¶ 3}   Around 4:00 p.m. on February 2, 2021, Harris went to the Third District Police Station to file a report. Surveillance video of the police station's parking lot showed him arriving in a white Dodge Avenger with distinctively decorated door panels on both sides of the vehicle and a black painted stripe covering the hood, roof, spoiler, and part of the rear-end bumper ("the Dodge"). The video showed Harris exiting the passenger side of the Dodge and wearing a dark-colored coat with a light-colored lining, collar, and design on the back. The state also presented still images taken from the surveillance video that displayed Harris's appearance. Harris walked inside the police station, while the Dodge waited in the parking lot. A surveillance camera posted inside the police station filmed Harris as he waited in the vestibule-lobby area and recorded his interactions with Officer Allen

Nagy, who testified that he took a report from "Jai'Shawn Harris" at the station.[1] The state also presented still images taken from this video displaying Harris's clothing, specifically the design on the back of his jacket. Approximately 25-30 minutes later, Harris exited the police station and got into the passenger side of the Dodge, and the vehicle exited the parking lot.

{¶ 4} Mounted police cameras around the area captured the distinctively marked Dodge traveling through the streets of Cleveland, specifically from East 55th Street to Kinsman Road. Macie Kalinowski, a crime scene analyst for Cleveland's Real Time Crime Center ("RTCC"), testified that RTCC cameras capture crimes as they happen and are a tool for officers in their investigations. The jury viewed RTCC video footage as Kalinowski explained the Dodge's path of travel.

{¶ 5} In state's exhibit Nos. 30.5.1 and 30.5.2, the cameras filmed the Dodge stopped in the turn lane at a red light at the intersection of East 55th, Woodland Avenue, and Kinsman, and a blue Ford 150 truck ("the Ford"), driven by Angel Jones ("Angel") stopped behind the Dodge. Angel's cousin, I.K. (hereinafter "the victim"), was riding in the front passenger seat. According to the victim, the stop light is a "short light," meaning there is not much time to make it through the light after it turns green.

{¶ 6} As the two vehicles waited for the light to turn green, unbeknownst to Angel, an ambulance with lights and sirens approached the intersection from the

---

[1] Officer Nagy was not asked to identify Harris in court as the person from whom he took the report.

west on Woodland, causing all vehicles to yield to the oncoming safety vehicle. The victim testified that the light turned green, but because the vehicle in front of Angel did not move due to the ambulance, Angel began honking the horn "incessantly." (Tr. 359.) Angel's honking triggered a road-rage incident that ended with Harris shooting at the Ford, striking the victim in the head.

{¶ 7} The victim testified that the Dodge "cut them off" after both vehicles turned onto Kinsman, causing Angel to chase after the Dodge. She stated that someone on the passenger side of the Dodge flipped them off, which caused Angel to "cut off" and "brake check" the Dodge, meaning that Angel deliberately stopped suddenly, which could cause the Dodge to hit them from behind. According to the victim, this occurred multiple times, and one time Angel braked "so hard" that the victim "flew out of [her] seat." (Tr. 362.)

{¶ 8} The RTCC videos showed that when both cars approached the intersection of Kinsman, Union Avenue, and East 140th Street, the Dodge stopped in the left lane, and the Ford stopped in the right lane just behind the back end of the Dodge. The victim testified that the driver of the Dodge exited the vehicle, confronted Angel, who remained seated inside the truck, and asked, "What are you doing? What's going on?" (Tr. 366.) According to the victim, Angel responded, "So you're just going to shoot us?" and then she "shrugged her shoulders." *Id*. The victim stated that she did not see the driver with a gun in his hand or pointing anything at them. She testified that she saw a "guy in a red ski" mask emerge from the passenger side of the vehicle. The victim stated that this person "starts to look

at me in my eyes, for about 30 seconds, just like staring at me in my eyes." (Tr. 368.) She stated that she became scared and turned toward the door to open it but was shot behind the left ear, just below the earlobe, severing part of her ear, and breaking her jaw, nose, and sinus. She stated that she was disoriented and unaware she had been shot, and thought they had been in a car accident. The jury watched body camera video footage of the victim following the shooting.

{¶ 9} The victim testified that after being hospitalized for five days, Detectives Zara Hudson and Salvatore Santolli spoke with her about the shooting and presented her with two photo arrays. In the first array, she identified the man in the red ski mask as the shooter with 80 percent certainty. In the second array, she identified the driver of the Dodge with 100 percent certainty. Detective Hudson testified that the victim identified Harris as the shooter, and Joshua Jones as the driver of the Dodge.

{¶ 10} On cross-examination, the victim admitted that she did not see a gun or anyone firing the gun. Nevertheless, she testified that she knew that Harris shot her because even though he was wearing a ski mask, she recognized his eyes because of "the way he was staring at [her] before he shot [her]," she saw little dreadlocks poking out of the mask, and based on the angle he was standing. (Tr. 379, 400.)

{¶ 11} Two surveillance cameras from an HP gas station nearby captured the conclusion of the road-rage incident that transpired from East 55th Street to Kinsman to East 140th. Detective Hudson identified state's exhibit No. 31.1 as one of the videos he obtained from HP. The camera faced Kinsman and captured the

interaction between the occupants of the Dodge and the Ford, but a gas pump partially obstructed the view of the Dodge vehicle. The state played the video in its entirety for the jury, and then played the video frame-by-frame, stopping on certain frames showing the occupants of the Dodge exiting the vehicle.

{¶ 12} Detective Hudson also identified state's exhibit No. 31.2, another video he obtained from HP from a camera also facing Kinsman, that captured the nearly 40-second interaction between the occupants of the Dodge and the Ford but where the view of the vehicles was unobstructed. Again, the state played the video uninterrupted for the jury, showing the sequence of the events of the Dodge stopping in the left lane of the street, the Ford stopping in the right lane in line with the back bumper of the Dodge, the occupants of the Dodge exiting the vehicle, and the Ford abruptly speeding off at an angle through the gas station. The state then played the video frame-by-frame, stopping on certain frames showing the person exiting the Dodge, who was seated in the front passenger seat. Detective Hudson testified about a frame of the video where "a glimmer of red" could be seen from the passenger's head. He testified that this was significant because his investigation revealed that the shooter exited the front passenger seat and was wearing a red mask. Detective Hudson also focused on the video frames that showed the passenger wearing a dark-colored coat with light trim and where a design on the back of coat was visible. The state also introduced still photos captured from the videos — exhibit Nos. 66.1 through 73. Detective Hudson testified that based on these images, the passenger seen exiting from the front passenger seat of the Dodge on Kinsman was dressed in

the same clothing that Harris was wearing at the Third District Police Station when he exited and entered the front passenger seat of the same vehicle. Detective Hudson admitted, however, that he did not see a firearm in the videos.

{¶ 13} Joshua Jones testified that he was driving his 2008 Dodge Avenger on the day of the shooting with "Rico" and Harris as passengers. He admitted that the vehicle seen in surveillance and RTCC videos is his vehicle. Jones stated that he was indicted as a codefendant in this case for tampering with evidence and obstructing justice because he deleted information from his cell phone that, according to Jones, would have inculpated him in connection with the shooting. He admitted further that he entered into a plea agreement with the state whereby he agreed to testify truthfully in exchange for a reduction of the charges against him.

{¶ 14} Jones testified that he drove Harris to the Third District Police Station and that he and Rico waited in the car in the parking lot as Harris went inside. He stated that about 25-30 minutes later, Harris returned to the car and sat in the front passenger seat. He described to the jury that Harris was wearing a jean jacket, gray hoodie, sweatpants, and a red ski mask that Harris had initially rolled up like a hat. Jones identified Harris in state's exhibit No. 19 — a still photo taken from surveillance video from the police station.

{¶ 15} Jones testified that as he drove back toward his house, a blue truck kept "brake checking" him from East 55th and Kinsman, up to Kinsman and East 140th. He denied that he engaged in any road-rage conduct but admitted that he sped around the Ford. Jones testified that he stopped his vehicle in the left lane and

the Ford stopped in the right lane just behind his vehicle. He stated that he got out of the car to confront the driver of the truck, and Rico exited from the driver's side back passenger seat. Jones stated that he walked behind his vehicle but never approached the window because he heard a gunshot and the truck sped off. Jones testified that he got into his car and drove off. During his testimony, the HP surveillance videos were played for the jury.

{¶ 16} According to Jones, he did not see anyone shooting a gun, but saw a gun earlier that day in the front passenger seat where Harris was seated. Although he testified that he did not see Harris shoot the gun, he stated that "when I turned around to get back in the car, I saw him holding the gun." (Tr. 577.) On cross-examination, however, he admitted that he never saw Harris holding the gun outside the car. (Tr. 587.) Jones stated that although he knew Rico to carry a gun and it was possible Rico had a gun on him that day, he knew that Rico did not shoot at the truck because the shot came from "his left." (Tr. 594.) Nevertheless, he stated that Rico "cleaned" the gun after the shooting. (Tr. 595-596.)[2]

{¶ 17} Jones admitted that he lied to the police on two occasions regarding the shooting: first when the police came to his house after the shooting, by telling them that he was not present at the time of the shooting, but that "Slim" was driving his car, and again when he gave his initial statement to police after he and Rico

---

[2] Jones admitted that the phrase "to clean," means to get rid of or dispose of evidence.

discussed the incident, by telling them that he was not in the car but that Rico told him that Harris was driving his car and "Brody" was the shooter.

{¶ 18} Anthony Thomas testified that he is known as "Rico" and that he was seated in the backseat of the Dodge on the day of the shooting. He stated that after Jones stopped to confront the driver, he stepped halfway out of the car "because knowing these friends that I'm with [they're] about ready to get in an altercation with whoever inside of the vehicle." (Tr. 669.) Thomas stated that he saw Harris get out of the front passenger seat and pull down the red mask he was wearing. According to Thomas, when the truck sped off, it almost hit Harris, and that is when he heard the gun shot. Although he testified that he did not see a gun, Thomas admitted that he saw "someone shoot." (Tr. 674.)[3] He testified later that Jones did not shoot the gun, and that he did not see either Jones or Harris holding a gun. Thomas identified Harris as the person in State's exhibit No. 11 — a still photo taken from the surveillance video inside the Third District police station lobby.

{¶ 19} Thomas admitted that he was untruthful with Detective Hudson when he initially told him that "Brody" was involved. His testimony also conflicted with Jones because he denied that he was in a biker gang or that they were at a biker clubhouse prior to the incident. He denied further that he has a concealed carry permit, carries a gun, or that he "dismantled" the gun after the shooting.

---

[3] The state did not ask a follow-up question.

{¶ 20} Detective Darryl Johnson testified that he processed and photographed the Ford following the shooting. He stated that he did not discover any bullet holes in the truck, but the driver's side rear passenger window was shattered and glass was on the inside of the vehicle floor.

{¶ 21} Despite being subpoenaed, Angel failed to appear for trial. Over objection, the trial court allowed the state to present video from Officer Demetrius Madison's body camera taken immediately after the shooting in which Angel stated that the shooter was wearing a red ski mask. According to Officer Madison, Angel was frantic, scared, and crying. Additionally, at the time when she made this statement, police did not have any suspects and had not yet located the Dodge.

{¶ 22} Harris did not put forth a defense. Harris stipulated to the serious-physical-harm element of Count 1, felonious assault, and the trial court instructed the jury about this stipulation. During deliberations, the jury notified the court on two occasions that they were deadlocked. After the second notification, the trial court gave the jury a *Howard* Charge. Later that same day, the jury returned its verdict of not guilty of Counts 1 and 6, but guilty of Counts 2, 3, 4, and 5, and all attendant specifications to those counts.

{¶ 23} Believing that the verdicts were inconsistent, Harris filed a "Civ.R. 50 JNOV," requesting a new trial. Following a hearing, the trial court denied Harris's motion. At sentencing and over objection, the trial court imposed an indefinite sentence pursuant to the Reagan Tokes Law of a minimum of 13 years in prison and a maximum of 16 and one-half years. This appeal follows.

## II. Manifest Weight of the Evidence

{¶ 24} In his first assignment of error, Harris contends that his convictions are against the manifest weight of the evidence because the jury reached inconsistent verdicts, the eyewitness identification was unreliable, and witnesses gave conflicting testimony.

{¶ 25} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest weight analysis, the reviewing court sits as a "thirteenth juror," and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins* at 386.

### A. Inconsistent Verdicts

{¶ 26} Without citing any case law, Harris contends that his convictions are against the manifest weight of the evidence because the verdicts are inconsistent.

Contrary to Harris's assertion, the fact that the jury found him guilty of felonious assault as charged in Count 2 (caused or attempted to cause physical harm by means of a deadly weapon) while not guilty of felonious assault as charged in Count 1 (caused serious physical harm), does not undermine the jury's resolution of the case. As this court has explained:

> "Juries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. * * * [I]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts."

*State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 40, quoting *State v. Taylor*, 8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶ 10. Additionally, "[i]t would be unfair for the defendant to have the right to appeal an inconsistent verdict when it suits him, when the government may not." *State v. Jones*, 8th Dist. Cuyahoga No. 96901, 2012-Ohio-920, ¶ 10 (noting that the Fifth Amendment prohibition against double jeopardy restricts the government from appealing an acquittal even if appears erroneous). Defendants receive adequate protection against jury "irrationality of error" by challenging the sufficiency of the evidence at both trial and appellate levels. *Id.*, citing *U.S. v. Powell*, 469 U.S. 57, 68, 105 S.Ct. 231, 83 L.Ed.2d 461 (1984). Accordingly, "courts have consistently rejected the argument that inconsistent verdicts would render a defendant's conviction against the manifest weight of the evidence." *Wells* at *id.*, citing *State v. Jones*, 8th Dist. Cuyahoga No. 108050, 2019-Ohio-5237, ¶ 33, citing *State v. Norman*, 10th Dist. Franklin No. 10AP-680, 2011-Ohio-2870, ¶ 14.

{¶ 27} Moreover, consistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal. *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978). Each count of a multicount indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt. *See State v. Hicks*, 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989). "The sanctity of the jury verdict should be preserved and [sh]ould not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy*, 79 Ohio St.3d 440, 444, 683 N.E.2d 1112 (1997).

{¶ 28} In this case, any inconsistency cannot be attributed solely to the jury's confusion or doubts as to the adequacy of evidence. Rather, the jury, convinced that Harris was guilty of felonious assault (knowingly caused or attempted to cause physical harm by means of a deadly weapon) under Count 2, may have acquitted him of felonious assault (knowingly caused serious physical harm) on Count 1 based on compromise or leniency. Based on the record before this court, this is quite possible because the jury notified the court on two occasions that they were deadlocked. Moreover, because this court is not permitted to speculate about the reason for the inconsistency when it determines the validity of a verdict, any perceived inconsistency here is not enough to undermine the jury's resolution of the case based on a manifest weight of the evidence challenge.

## B. Identification and Conflicting Testimony

{¶ 29} Harris also challenges that his convictions are against the weight of the evidence because the testimony identifying him as the shooter was unreliable. Specifically, he contends that the victim only identified him from the photo array with 80 percent certainty and the testimony by Jones and Thomas was suspect.

{¶ 30} Regarding the victim's out-of-court identification, she admitted that she was only 80 percent certain that the person she identified in the photo array was the person wearing the red ski mask, whom she believed shot her. Moreover, the victim did not definitively testify that she saw the man shoot the gun. In fact, she admitted that she did not see a gun and did not see the man wearing the red ski mask with a gun, yet testified that she knew that the person who wore the red ski mask shot the gun because of the angle from which he was standing, the fact that he wore a ski mask, and because the person was staring at her "like he wanted to do something." Nevertheless, at trial the victim unequivocally testified and identified Harris as the person who shot her. The jury considered her out-of-court identification in contrast to her testimony, and as the trier of fact, was able to assess what weight it should give to her identification of Harris. """Juries are not so susceptible that they cannot measure intelligently the weight of the identification testimony that has some questionable feature."" *State v. Deal*, 8th Dist. Cuyahoga No. 92642, 2010-Ohio-153, ¶ 11, quoting *State v. Coleman*, 10th Dist. Franklin No. 99AP-1387, 2000 Ohio App. LEXIS 5386, 8 (Nov. 21, 2000), quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Moreover, even

discounting her testimony and out-of-court identification, the jury was presented with surveillance video and still photographs, and was thus able to make its own determination if the evidence proved that Harris was the shooter.

{¶ 31} Regarding the testimony of both Jones and Thomas, "[t]he trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible." *State v. Williams*, 8th Dist. Cuyahoga No. 103257, 2016-Ohio-5403, ¶ 33. It is undisputed that both Jones and Thomas were untruthful to the police when they provided their initial statements. Additionally, Jones admitted that he entered into a plea deal with the state for a reduction in his charges. Harris's counsel brought any inconsistencies, questionable testimony, and self-serving motivations to the jury's attention. "The jury was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34.

{¶ 32} Based on the foregoing, this case is not the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice that requires this court to reverse Harris's convictions and order a new trial. The jury could not ignore the surveillance videos that captured the shooting and the videos from the Third District police station showing Harris and his clothing. Moreover, Jones and Thomas testified consistently with those videos that Harris was the frontseat passenger of the Dodge and wearing the exact clothing depicted in the police station videos. Moreover, although no one testified that they saw Harris with

a gun, Jones testified that he had seen a gun in the front passenger seat where Harris was seated. Accordingly, based on the direct and circumstantial evidence presented, the jury could have easily inferred that Harris was the person wearing the red ski mask that shot at the Ford, striking the victim.

{¶ 33} Harris's first assignment of error is overruled.

## III. Effective Assistance of Counsel

{¶ 34} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defense to deprive the defendant of a fair trial. *State v. Nieves*, 8th Dist. Cuyahoga No. 111161, 2022-Ohio-3040, ¶ 27, citing *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 109. Deficient performance occurs when counsel's performance falls below an objective standard of reasonable representation. *State v. Bell*, 8th Dist. Cuyahoga No. 105000, 2017-Ohio-7168, ¶ 23. Prejudice is found when "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 35} A defendant has the burden of proving ineffective assistance of counsel and there is a strong presumption that a properly licensed trial counsel rendered adequate assistance. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). As the *Strickland* Court stated, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland* at 689; *see also State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). A defendant's failure to satisfy one part of the *Strickland* test negates a court's need to consider the other. *State v. Hurst*, 12th Dist. Brown No. CA2014-02-004, 2014-Ohio-4890, ¶ 7.

{¶ 36} In his second assignment of error, Harris contends that he was denied effective assistance of counsel, in violation of his right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution, because counsel failed to challenge the victim's out-of-court identification by reviving former counsel's motion or by filing his own motion to suppress or performing a voir dire of the victim on the identification process.

{¶ 37} The failure to file a motion to suppress evidence is not enough in itself to sustain a claim for ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-483, 873 N.E.2d 858, ¶ 65. "'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.'" *State v. Logan*, 8th Dist. Cuyahoga No. 88472, 2007-Ohio-2636, ¶ 66, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980).

{¶ 38} The record demonstrates that Harris's prior attorney filed a motion for voir dire of identification witnesses and for disclosure of other evidence used in identification. According to the record, at the time of this filing, the state had not yet supplemented its discovery to include surveillance videos and still photographs from the Third District and the surveillance videos obtained from the HP gas station — this occurred after prior counsel filed the motion, but before trial counsel entered his appearance as counsel. Accordingly, the victim's out-of-court identification of Harris was no longer the only evidence the state possessed that identified Harris, placed Harris in the Dodge at the time of the shooting, and depicted what Harris was wearing. Trial counsel may have determined that the additional media evidence changed the defense strategy to create reasonable doubt that Harris was in fact the shooter. Accordingly, this court will not second-guess defense counsel's case strategy. *State v. Sallie*, 81 Ohio St.3d 673, 674, 693 N.E.2d 267 (1998).

{¶ 39} In *Logan*, this court held that counsel's tactical decision to discredit the victim's identification by thorough cross-examination rather than through suppression or conducting voir dire was not ineffective assistance. *Id.* at ¶ 62-64. Similar to *Logan*, this court's review of the record reveals that counsel effectively cross-examined the victim about her photo array identification. The victim admitted she was only 80 percent certain that the person she identified in the photo array was the person wearing the red ski mask, whom she believed shot her. Moreover, the victim did not definitively testify that she saw the man shoot the gun.

In fact, she admitted that she did not see a gun or see the man wearing the red ski mask with a gun, yet testified and identified Harris as the person who shot her.

{¶ 40} Moreover, even if counsel was successful in suppressing the victim's out-of-court identification of Harris as the shooter, the state's evidence also consisted of testimony and surveillance videos demonstrating that Harris was a passenger in the Dodge vehicle at the time of the shooting. Based on that evidence alone, the jury was able to determine whether Harris was the shooter. Accordingly, Harris cannot demonstrate that he was prejudiced by counsel's decision not to file a motion to suppress the victim's out-of-court identification of Harris.

{¶ 41} His second assignment of error is overruled.

## IV. Reagan Tokes Law

{¶ 42} In his third assignment of error, Harris contends the trial court erred when it sentenced him to an indefinite sentence under S.B. 201, commonly referred to as the Reagan Tokes Law, because the law is unconstitutional under the United States and Ohio constitutions because it violates due process, the separation-of-powers doctrine, and the right to trial by jury.[4]

{¶ 43} Harris acknowledges that this court's en banc decision of *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 17-51 (8th Dist.) rejected these

---

[4] Neither party has raised any issue as to the imposed terms of Harris's sentence; therefore, any determination as to the validity of the sentence other than challenges raised herein, is beyond the scope of this direct appeal. *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, ¶ 26; *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, ¶ 27.

arguments that challenge the constitutionality of the Reagan Tokes Law, but contends that *Delvallie* "failed to properly focus on what and how the sentencing tail may be triggered"; thus, he contends the law violates his due process rights. We disagree. *Delvallie* fully and completely addressed the concerns Harris raises, and he has not raised any additional arguments not considered by the *Delvallie* en banc court. Based on the authority of *Delvallie*, we summarily overrule Harris's challenges and overrule his assignment of error.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
LISA B. FORBES, J., CONCUR

N.B. Judge Lisa B. Forbes is constrained to apply *Delvallie*. For a full explanation, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (Forbes, J., dissenting).